The ruling in the case of Elkins v. Board of School Directors, 138 La. 207, 70 South. 99, on rehearing, 138 La. 217, 70 South. 103, is in point, and will be repeated here as decisive of this case:

"The list of property taxpayers, by which the commissioners were governed in conducting this election, was made and furnished by an unauthorized person, and we have concluded that, although no actual fraud has been shown in this case, our approval of the illegal or irregular proceedings by which this tax was imposed might establish an unwise and harmful precedent. * * *

"The evidence discloses that a list of names, without any valuation of property, was furnished by a deputy clerk of court to the local superintendent of the public schools, who copied it, and, with the assistance of the assessor, put the assessed valuation of the property of each taxpayer on the copy of the list, and gave it to the commissioners of election. After this unauthorized list, or copy of the list, containing only 28 names, furnished by the deputy clerk of court, was delivered to the commissioners, 10 names were added with a pencil by an unauthorized person. And it does not appear that the commissioners required any voter whose name was thus added to the list to furnish an affidavit of his right to vote.

"This illegality in the proceedings warrants the annulment of the tax."

See, also, Capps v. Parish Board, 138 La. 348, 70 South. 322.

It is therefore ordered, adjudged and decreed that the judgment appealed from be reversed, and that there now be judgment in favor of plaintiffs as prayed for.

O'NIELL, J., concurs in the decree.

_____

(77 South. 586)

No. 22530.

RAILSBACK v. KEITH et al.

In re KEITH et al.

(Nov. 26, 1917. Rehearing Denied Jan. 28, 1918.)

*(Syllabus by Editorial Staff.)*

1. ADVERSE POSSESSION ☞23—PRESCRIPTION — SUFFICIENCY OF POSSESSION — CUTTING TIMBER.

The cutting of choice trees here and there throughout a tract of 2,386 acres, and possibly adjoining lands, the lines not being marked, at a time when timber was of little value, was not the continuous, uninterrupted, public, and unequivocal possession which Civ. Code, art. 3487, requires for prescription.

2. ADVERSE POSSESSION ☞100(1)—PRESCRIPTION—EXTENT OF POSSESSION.

Where a party's agent caused 40 acres of land to be surveyed as a separate tract and the lines to be well marked, and put a tenant in possession of it, who at once cleared about 5 acres, and built a house in, and cultivated, the clearing, continuously thereafter, this open and unequivocal possession as owner of part of the 40 acres with title to the whole was plainly sufficient for prescription.

3. ADVERSE POSSESSION ☞114(2)—PRESCRIPTION—EVIDENCE—WEIGHT.

Where plaintiff offered testimony as to cutting cross-ties and wood on a tract of land at about the same time defendant was in possession through a tenant who was living on the land and cultivating a part of it, but also testified that he never had the land surveyed until within a few years, his testimony could be reconciled with defendant's evidence by supposing that he did not know the lines.

4. ADVERSE POSSESSION ☞60(1)—PRESCRIPTION—HOSTILE CHARACTER OF POSSESSION.

Carrying away treetops that had been left on the ground to rot was not an act of hostile possession of land.

Certiorari to Court of Appeal, Parish of Caddo.

Suit by J. B. Railsback against P. P. Keith and others. Judgment of the district court in favor of defendant was reversed by the Court of Appeal, and defendants apply for certiorari or writ of review. Judgment of the Court of Appeal set aside, and that of the district court reinstated and affirmed.

Foster, Looney & Wilkinson, of Shreveport, for relators. Blanchard & Smith, of Shreveport, for respondent.

PROVOSTY, J. The property involved in these two consolidated suits is the N. W. ¼ of the S. E. ¼ of Sec. 1, Tp. 16 N., R. 14 W., parish of Caddo, a 40-acre square. One of the suits is a jactitation suit, and involves all of said 40-acre square, except some 5 acres in the southwest corner. The other suit involves this 5 acres, and is a petitory action.

RAILSBACK v. KEITH

To the jactitation suit defendants excepted, on the ground that plaintiff did not have possession, and therefore could not maintain a jactitation suit. Without asking for a separate trial of this exception, but with reserve of it, defendants some time afterward filed an answer in each of the suits, claiming title. The cases were consolidated, and tried.

Defendants trace title to the government by the following chain:

United States to Vicksburg, Shreveport & Texas Railroad, 1859;

Vicksburg, Shreveport & Texas Railroad to Jackson and others, 1879;

Jackson and others to Vicksburg, Shreveport & Pacific Railroad, 1881;

Vicksburg, Shreveport & Pacific Railroad to Leon M. Carter, 1900;

Carter to defendants.

Plaintiff's title goes no further back than a conveyance by R. A. Cutliff to J. R. Cutliff of an undivided half interest of certain lands described according to maps of United States surveys, of which the 40 acres in suit formed a part. This was in 1837, 22 years before the title had passed out of the government.

In 1855 the two Cutliffs conveyed by the same description to J. R. Dunlap.

A few months later Dunlap reconveyed by the same description to the two Cutliffs.

Both of these acts recite that the land thus sold is "known as Cutliff Mill tract"; and in both acts a one-third interest is sold in a sawmill, etc., on said land.

By same description J. R. Cutliff in March, 1858, conveyed this undivided half to B. F. Logan; the total area of the lands being fixed at 1,386.44 acres.

By same description R. A. Cutliff conveyed in February, 1859, his undivided half to the same Logan, and by the same act conveyed to Logan an undivided half of an undivided half of other lands.

In 1865 Logan executed a bond of title in favor of G. W. and L. M. McDuffie to "a certain tract of land known as the Cutliff Sawmill tract, containing about 2,300 acres, more or less."

Three days later G. W. McDuffie conveyed his undivided half by same description to J. D. and D. W. Cawthon, the act reciting that there are buildings and improvements upon the tract, including a sawmill.

The next link in plaintiff's chain of title is an agreement of date May, 1868, between the heirs of Logan, the two McDuffies, and the two Cawthons, by which the said heirs and Logan declared that:

"The land and improvements thereon, situated in the parish of Caddo and known as the Cutliff Sawmill tract, sold by B. F. Logan, Sr., deceased, to G. W. and L. M. McDuffie, and for which said lands, said Logan, Sr., neglected to give notarial title to said purchaser, may be by them transferred to J. D. and G. W. Cawthon on the following conditions"; the said Cawthons to execute their notes secured by mortgage on said property, and "on transfer of said property from G. W. and L. M. McDuffie to J. D. and G. W. Cawthon and execution of above-mentioned notes" the Logans to "release G. W. and L. M. McDuffie from payment of a certain note drawn by them in favor of B. F. Logan, Sr., which said note was given in purchase of said Cutliff Sawmill tract; and the said G. W. and L. M. McDuffie hereby renounce and abandon all and any claims they may have possessed to said property by reason of their contract with B. F. Logan, Sr., subrogating the said J. D. and G. W. Cawthon thereto, who on their part agree to and hereby bind themselves to purchase the said described property on the terms and conditions heretofore mentioned."

The next link is a sale of date August, 1868, by which G. W. Cawthon transfers to J. D. Cawthon an undivided half of property described as follows:

"That certain tract of land known as Cutliff Sawmill land, being situated in the parish of Caddo, La., and being the same land purchased by these parties from L. M. McDuffie on 25th Feby., 1867, and fully described in act of mortgage from these parties to heirs of B. F. Logan, Sr., dated May 2, 1868, and recorded Book of Mortgages D, p. 414, to which act of mortgage reference is hereby made."

The lands described in this act of mortgage have an area of 2,386.44 acres.

The next link is a sale of date August, 1891, by which J. D. Cawthon sells to John B. Railsback certain lands described according to maps of United States surveys, which lands, the act declares, are "known as the Riverdale plantation on Red river and the Ferry Field place on Bayou Pierre, and are subject to a mortgage," etc., and the act goes on to declare that there are also sold certain other lands, also described according to maps of United States surveys. Among the latter lands thus described the land in suit is included.

The Railsback who thus purchased was the father of plaintiff, from whom plaintiff derived title by inheritance.

Plaintiff also relies upon a tax sale to J. H. Shepard, of date July, 1893, of the said Riverdale and Ferry Field plantations under an assessment to J. D. Cawthon, and a sale by Shepard to John H. Lucas of these same two plantations, of date March, 1894, Lucas being merely a straw man for Railsback, but the land in dispute not having formed part of those two plantations, we do not see what these sales have to do with the case.

For sustaining his plea of prescription of ten years plaintiff relies upon the title of J. D. Cawthon and his possession, and upon acts of possession subsequent to the purchase by Railsback. The agreement of date May, 1868, between the heirs of Logan, the McDuffies, and the Cawthons was no more than an agreement to make title. But granting that such an agreement to make title is equivalent for the purposes of prescription to the "title sufficient to transfer the property" which the law (C. C. art. 3479) requires, and granting that the description in this agreement is sufficient, we do not think the acts of possession proved by plaintiff are sufficient for prescription.

[1] The lands in that locality are very flat, mostly unfit for cultivation; what are known as "pin oaks" lands, with some pine timber on them. The locality was only sparsely settled—all woods, we gather, with small clearings here and there. The Cutliff sawmill was about a mile on an air line from the land in dispute. J. D. Cawthon acquired another sawmill in that locality, but how far it was from this land, and whether he ever transferred it to the 2,386.44-acre tract acquired from the McDuffies, the record does not definitely show. His son was plaintiff's principal witness for showing acts of possession. He testified that:

His father used this land for cutting timber for the sawmill, from 1868 or 1869 until the mills were moved in 1875. "Q. Did he go openly upon the land and have the timber cut or did he go there secretly? A. Well, as we first started to cut it, we cut it through and cut all of the good timber that was on it; of course, in those times we didn't saw the logs as they do to-day; we took the big timber. * * * Q. Did your father have a contract with the city of Shreveport for furnishing timber for the paving of the street? A. Yes, sir; that is for the oak, Texas street. Q. Did any of it come off of this 40 acres? A. Some of it did. * * * Q. Did you know the lines? A. No, sir; but I know it was cut off of that, and the others adjoining. Q. Is there any indication of there having been a cut made on that land some time ago? A. Yes, sir. You can find old pine stumps there yet—that is where there were rich pine, the timber was thick there when father bought it. Q. You all cut all the pine? A. No, sir; we only cut the best. Q. How old were you then? A. I was born in 1856, and this was in 1868 or 1869 when this timber was cut. I know that I was old enough to drive an ox team then."

Mr. A. H. Leonard, plaintiff's only other witness to possession by J. D. Cawthon, testified, as follows:

"A. I knew the Cawthon mill very well. Q. That was not a great distance from this property? A. A mile and a half or two miles; that is, the two mills were about that far apart. Q. The Cawthon mill was only a short distance? A. Not more than a mile."

The Cutliff sawmill tract contained 2,386.44 acres. The timber was not cut by a regular progression, but the best trees were picked out here and there. The witness Cawthon was in his eleventh year when the alleged cuttings began. He did not know the lines,

and does not know them now. How he can therefore be so positive that timber was cut on this particular 40 acres out of .the 2,386 acres is rather strange. But granting that he is not mistaken, the cutting was merely of the choice trees here and there throughout this 2,386 acres (and adjoining lands, for all one knows, the lines not being marked); and such a cutting as this in those days when timber was of little value—timbered lands being purchasable from the government at a pittance—is not the "continuous and uninterrupted, public, and unequivocal" possession which the law (article 3487, C. C.) requires for prescription.

[2] If we are mistaken, however, in this appreciation of this evidence, the plaintiff is no better off, for in 1893 Mr. Flournoy, as the agent of the Vicksburg, Shreveport & Pacific Railroad Company, caused this 40 acres of land to be surveyed as a separate tract and the lines to be well marked, and put a tenant in possession of it, who at once cleared some 5 acres of it, and built a house in, and cultivated, this clearing; and this 5 acres has been possessed and cultivated by persons holding under defendants and their authors in title up to date. This open and unequivocal possession as owner of part of this 40 acres with title to the whole was plainly sufficient for prescription. The learned district judge so found, and gave defendants judgment, correctly, we think.

Mr. Flournoy testifies that in 1896 he sold to the Signor Burton Company all the tie timber on this 40 acres, and that he knows that this company cut this timber because he went on this particular 40 acres and inspected the ties after they were cut; he being familiar with this 40 acres, from having followed the surveyor in person when it was surveyed, and caused the lines to be well marked.

[3, 4] Opposed to this, plaintiff offers his own testimony and that of another witness to show acts of possession by the cutting of cross-ties and wood on this 40 at about the same time. Plaintiff was asked by the court whether they had ever had their lands surveyed, and he answered:

"Not until 1910. When we got this land, we had lands around there for miles, and we did not have the money to have it surveyed."

The reconcilement of plaintiff's testimony with that of Flournoy is by supposing that plaintiff did not know the lines. The other witness testified that by authority from Railsback he during several years took the treetops that had been left on the ground, and took trees after the treetops had been all taken. But his testimony is of the vaguest as to where the trees were taken, and his taking of the treetops could hardly be considered an act of hostile possession, as, doubtless, no one would ever have thought of objecting to any one taking treetops left on the ground to rot.

We do not pass upon the question much discussed in the briefs as to whether defendants waived their exception of plaintiff's lack of possession for maintaining the jactitation suit, as the conclusion we have reached on the question of title deprives defendants of all interest in that exception.

The judgment of the Court of Appeal is therefore set aside, and that of the district court is reinstated, and affirmed; the plaintiff to pay the costs of the suit.

LECHE, J., takes no part.